UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PRISCILLA M. GREEN,

|  |  |  |
|---|---|---|
|  | Plaintiff, | REPORT |
|  |  | and |
| v. |  | RECOMMENDATION |
|  |  | ----------------------------- |
| AVIS BUDGET GROUP, INC., |  | DECISION |
| CHRISTOPHER NEUDORF, |  | and |
| CHRISTOPHER CHAPPELL, |  | ORDER |
| SEAN BISHOP, |  |  |
| GARY DEMPSEY, and |  | 11-CV-00269V(F) |
| JOE DONNELLY, City Manager, |  |  |

Defendants.
_____

APPEARANCES:      PRISCILLA M. GREEN, *Pro Se*
                  615 Main Street, No. 1873
                  Niagara Falls, New York  14302

                  HARRIS BEACH PLLC
                  Attorneys for Defendants
                  MARNIE E. SMITH,
                  SCOTT D. PIPER, and
                  KYLE WILLIAM STURGESS, of Counsel
                  99 Garnsey Road
                  Pittsford, New York  14534

## **JURISDICTION**

On October 29, 2014, this action was referred to the undersigned by Honorable

Richard J. Arcara for all pre-trial matters including preparation of a report and

recommendation on dispositive motions.[1]  The matter is presently before the court on

Defendants' motion filed July 24, 2015, seeking summary judgment (Dkt. 169), Plaintiff's

motion filed November 20, 2015, to strike Defendants' summary judgment motion (Dkt.

184),  Plaintiff's motion filed January 29, 2016, requesting the court to accept untimely-

---

[1] By Text Ordered entered December 4, 2015 (Dkt. 185), this case was reassigned to Honorable
Lawrence J. Vilardo.

filed exhibits (Dkt. 194), and Defendants' cross-motion filed February 12, 2016, seeking to strike Plaintiff's exhibits untimely-file in opposition to summary judgment (Dkt. 195).[2]

## **BACKGROUND**

On March 25, 2011, Plaintiff Priscilla M. Green ("Plaintiff" or "Green"), an African-American woman, then represented by David J. Seeger, Esq. ("Seeger"), commenced this action alleging two claims pursuant to 42 U.S.C. § 1981 for race-based employment discrimination and retaliation, against Defendants Avis Budget Group, Inc. ("Avis"), Avis City Manager Joe Donnelly ("Donnelly"), Avis Airport Manager Christopher Neudorf ("Neudorf"), and shift managers Christopher Chappell ("Chappell"), Sean Bishop ("Bishop"), and Gary Dempsey ("Dempsey") (together, "Defendants").  On September 19, 2012, Seeger moved to withdraw as Plaintiff's attorney (Dkt. 25), asserting Plaintiff's refusal to sign a HIPAA-complaint authorization form for release of Plaintiff's health records, despite Plaintiff having placed her health in issue by alleging physical stress and emotional distress, had placed Seeger in an untenable position.  Following an October 12, 2012 status conference, Seeger's motion was granted (Dkt. 27).  On January 3, 2013, Prathima C. Reddy, Esq. ("Reddy"), filed an appearance on Plaintiff's behalf.  (Dkt. 32).

On March 4, 2013, Plaintiff, then represented by Reddy, moved for leave to file an amended complaint (Dkt. 39), which was granted on March 6, 2013 (Dkt. 40). Accordingly, on March 6, 2013, Plaintiff filed the Amended Complaint (Dkt. 41)

---

[2] Although Defendants' motion for summary judgment is dispositive, whereas Plaintiff's motions to strike Defendants' summary judgment motion and requesting the court accept her exhibits filed after the deadline for her response opposing Defendants' summary judgment motion, as well as Defendants' cross-motion to strike Plaintiff's motion are nondispositive, all three pending motions are addressed in this combined Report and Recommendation/Decision and Order in the interest of judicial economy.

("Amended Complaint"), naming the same Defendants, and alleging five claims for relief including (1) discrimination against all Defendants in violation of 42 U.S.C. § 1981 ("First Claim"); (2) retaliation against all Defendants in violation of 42 U.S.C. § 1981 ("Second Claim"); (3) disparate treatment and hostile work environment against Defendant Avis in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL" or "HRL") ("Third Claim"); (4) retaliation against Defendant Avis in violation of Title VII and New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("Fourth Claim"); and (5) discrimination against Defendant Neudorf in violation of NYSHRL ("Fifth Claim").  Plaintiff's Second and Fourth Claims alleging retaliation are based on her assertion that since filing the instant action, Plaintiff has had commissions she earned for selling upgrades ("upsales" or "upsale commissions")) stolen from her, she has been subjected to further harassment by her co-workers, that her employment was terminated on February 6, 2013.  Defendants filed their answer to the Amended Complaint on March 26, 2013 (Dkt. 42).

On December 11, 2013, Reddy moved for permission to withdraw as Plaintiff's attorney (Dkt. 50), citing a breakdown in communication such that the attorney-client representation was irreconcilable.  Following a January 14, 2014 status conference, that motion was granted.  (Dkt. 53).  Since then, Plaintiff has proceeded in this matter *pro se*.

On July 24, 2015, Defendants filed the instant motion for summary judgment (Dkt. 169) ("Defendants' Motion for Summary Judgment"), attaching a notice advising Plaintiff that failure to respond in opposition to Defendants' Motion could result in

summary judgment being granted in favor of Defendants and dismissal of Plaintiff's action (Dkt. 169-1), Defendants' Statement of Material Facts Not in Dispute (Dkt. 169-2) ("Defendants' Statement of Facts"), exhibits 1 through 80 (Dkts. 169-3 through 169-10) ("Defendants' Exh(s). __"), the Affidavit of Shaun Bishop in Support of Defendants' Motion for Summary Judgment (Dkt. 169-11) ("Bishop Affidavit"), the Affidavit of Christopher Chappell in Support of Defendants' Motion for Summary Judgment (Dkt. 169-12) ("Chappell Affidavit"), the Affidavit of Gary Dempsey in Support of Defendants' Motion for Summary Judgment (Dkt. 169-13) ("Dempsey Affidavit"), the Affidavit of Joseph Donnelly in Support of Defendants' Motion for Summary Judgment (Dkt. 169-14) ("Donnelly Affidavit"), the Affidavit of Dahianara Moran in Support of Defendants' Motion for Summary Judgment (Dkt. 169-15) ("Moran Affidavit"), the Affidavit of Kimberly Moussavian in Support of Defendants' Motion for Summary Judgment (Dkt. 169-16) ("Moussavian Affidavit"), the Affidavit of Christopher Neudorf in Support of Defendants' Motion for Summary Judgment (Dkt. 169-17) ("Neudorf Affidavit"), the Affidavit of Eric Pollack in Support of Defendants' Motion for Summary Judgment (Dkt. 169-18) ("Pollack Affidavit"), and Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 169-19) ("Defendants' Memorandum – Summary Judgment").  In opposition to Defendants' Motion, Plaintiff filed on November 4, 2015, Plaintiff's Reply to Defendant's Summary Judgment and Motion to Dismiss Defendant's Summary Judgment (Dkt. 180) ("Plaintiff's Response").  On November 20, 2015, Plaintiff filed another document entitled Notice of Motion for Extension to Submit Exhibits to "Reply to Summary Judgment" and Motion to Dismiss Defendants Summary Judgment (Dkt. 184) ("Plaintiff's Motion Opposing Summary Judgment"), consisting of a

motion for an extension of time to file exhibits, which the court granted by Text Order entered December 4, 2015 (Dkt. 186), as well as an affirmation by Plaintiff opposing summary judgment ("Plaintiff's Affirmation Opposing Summary Judgment").  On January 27, 2016, Defendants filed the Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 (Dkt. 193) ("Defendants' Reply – Summary Judgment").

On January 29, 2016, Plaintiff filed a Motion to Accept Exhibits Submitted by the Plaintiff "To Summary Judgment" [*sic*] and "Motion to Dismiss Defendants Summary Judgment" [*sic*] & Grant an Appeal for an Expidited [*sic*] Hearing and Trial Date (Dkt. 194) ("Plaintiff's Motion for Late Filing"), supported by the attached Affirmation of Plaintiff Priscilla M. Green ("Plaintiff's Affirmation"), and exhibits 1 through 30 ("Plaintiff's Exh(s). __").  On February 12, 2016, Defendants filed a Cross-Motion to Strike Plaintiff's January 28, 2016 Submissions (Dkt. 195) ("Defendants' Cross-Motion to Strike"), attaching the Attorney Scott D. Piper, Esq., Affirmation in Opposition to Plaintiff's Motion and in Support of Cross-Motion to Strike Plaintiff's January 28, 2016 Submissions (Dkt. 195-1) ("Piper Affirmation"), and Defendants' Memorandum of Law in Support of Cross-Motion to Strike Plaintiff's January 28, 2016 Submissions and Oppose Plaintiff's Motion for Miscellaneous Relief; and/or for an Opportunity to Reply to Plaintiff's Opposition to Summary Judgment (Dkt. 195-2) ("Defendants' Memorandum – Cross-Motion to Strike").  On March 24, 2016, Defendants filed the Attorney Affirmation of Scott D. Piper, Esq., in Opposition to Plaintiff's Motion to Accept Exhibits and for Other Miscellaneous Relief (Dkt. 197) ("Piper Response Affirmation").  On June 1, 2016, Plaintiff filed Plaintiff's Opposition to "Motion to Strike" & "Cross Motion" (Dkt. 208) ("Plaintiff's

Response – Cross-Motion to Strike"), attaching the Affirmation of Plaintiff Priscilla M.

Green ("Plaintiff's Reply Affirmation").  On June 8, 2016, Defendants filed the Attorney

Scott D. Piper, Esq., Reply Affirmation in Further Support of Cross-Motion to Strike

Plaintiff's January 28, 2016 Submission (Dkt. 209) ("Piper Reply Affirmation"), attaching

Defendants' Reply Memorandum of Law in Further Support of Cross-Motion to Strike

Plaintiff's January 28, 2016 Submissions (Dkt. 209-1) ("Defendants' Reply - Cross-

Motion to Strike").  Oral argument was deemed unnecessary.

Based on the following, Defendants' Motion for Summary Judgment should be

GRANTED; Plaintiff's Motion Opposing Summary Judgment should be DENIED;

Plaintiff's Motion for Late Filing is DENIED; Defendants' Cross-Motion to Strike is

GRANTED.

## FACTS[3]

On May 15, 2007, Plaintiff Priscilla M. Green ("Plaintiff" or "Green"), an African-

American woman, commenced employment with Defendant Avis Budget Group, Inc.[4]

("Avis" or "the Company"), working as a Rental Sales Agent ("RSA").  As an RSA,

Plaintiff worked at the Company's sales counter at the Buffalo Niagara International

Airport ("the Buffalo Airport"), in Cheektowaga, New York, assisting customers with their

car rentals.  During Plaintiff's employment with Avis, the Operations Managers[5] who

directly supervised Plaintiff's work at the Buffalo Airport location included Defendants

---

[3] Taken from the pleadings and motion papers filed in this action.
[4] Defendants maintain, Defendants' Memorandum – Summary Judgment at 1, n. 1, that "Plaintiff was actually employed by **Avis Rent a Car System, LLC,** a wholly owned subsidiary of Avis Budget Group, Inc." (bold in original).
[5] The job title "Shift Manager" was changed to "Operations Manager" during the time period relevant to this action.

Christopher Chappell ("Chappell"), Shaun Bishop ("Bishop"), and Gary Dempsey ("Dempsey").  The Operations Managers reported to Defendant Christopher Neudorf ("Neudorf"), Avis's Buffalo Airport location manager, who reported to Defendant Joseph Donnelly ("Donnelly"), the City Manager for Avis in Buffalo, New York, whose office is located in an administrative building ("the administrative building"), on the opposite side of a road[6] from the Buffalo Airport location.  Defendant Eric Pollack ("Pollack"), was the Company's Northeast Area Human Resources Director until 2012, when Pollack became Director of Labor Relations North America for Avis.  Defendant Kimberly Moussavian ("Moussavian"), was Avis's Human Resources Manager for New York and New England Operations, reporting to Pollack, until mid-2012, when Moussavian became New York Operations Manager and responsibility for Avis's Buffalo Airport location was transitioned away from her.  Defendant Dahianara Moran ("Moran"), became Avis's New England Area Human Resources Manager on July 10, 2012, when she also began assuming the human resources responsibilities previously handled by Moussavian for the Buffalo Airport location.  On May 15, 2007, during her first week of employment with Avis, Plaintiff, who was interviewed and hired by Neudorf, signed the Employee Acknowledgment Form acknowledging receipt of a copy of a manual entitled "Taking the High Road, Code of Conduct and Business Principles" ("Code of Conduct"),[7] and a copy of Avis's "Anti-Discrimination/Anti-Harassment Policy" ("Anti-Harassment Policy"),[8] a formal, written policy prohibiting employees from engaging in any discrimination, harassment, and retaliation based on, *inter alia*, race, color, and

---

[6] The road is not further identified.
[7] Donnelly Affidavit ¶ 9; Defendants' Exh. 9.
[8] Donnelly Affidavit Exh. 11.

national origin.  Anti-Harassment Policy at 1-2.  A copy of the Anti-Harassment Policy

was also posted on the back wall of Avis's administrative building.

    As an RSA, Plaintiff's job duties included matching rental vehicles to customers'

needs, suggesting upgrades such as the global navigational satellite system Global

Positioning System ("GPS"), and satellite radio, as well as checking in vehicles upon

their return.  Although Plaintiff generally worked at Avis's sales counter ("the sales

counter"), in the Buffalo Airport, she occasionally worked in the kiosk ("the kiosk"),

located in rental car parking area where Avis's "preferred" customers were

accommodated.  Throughout Plaintiff's tenure with Avis, 43 RSAs worked for Avis at the

Buffalo Airport location, including five with more seniority than Plaintiff, *i.e.*, Sharlene

Munro ("Munro"), Janice Warner ("Warner"), Patricia Lleras ("Lleras"), Deborah Blask

("Blask"), and Valerie Stachewicz ("Stachewicz").  All RSAs reported to Operations

Managers.

    Throughout her employment with Avis, Plaintiff, rather than speaking with the

relevant manager or co-worker, often addressed routine work issues, including

scheduling requests, vacation requests, sick leave, pay issues, training questions,

customer service issues, and disputes with other co-workers, through detailed hand-

written or typed notes, letters and memoranda addressed to and sent by certified mail,

or left in Avis's office to be found by the relevant manager or coworker.  Plaintiff also

made numerous complaints about a myriad of perceived personnel issues she claims to

have encountered with co-workers and managers.  Although recounted in great detail in

the papers filed in this action, the court references only the more substantive complaints

relevant here, particularly those pertaining to Plaintiff's rate of pay, scheduling, work performance and training, and handling of cash transactions.

**Pay Rate**

Upon commencing employment with Avis, Plaintiff was paid $ 8.50 per hour, less than the $ 9.00 hourly rate Plaintiff maintains Neudorf promised when extending the job offer to Plaintiff.  After complaining to Pollack in November 2010, that she was paid less than the $ 9 hour rate newly hired white RSAs were paid, Pollack reviewed a chart of the hourly wages then being paid to RSAs, showing Plaintiff was then being paid $ 10.25 per hour, with three RSAs, including Linda E. Howey ("Howey," date of hire ("DOH") April 26, 2010), Rebecca Roblee ("Roblee," DOH July 26, 2010), and Abdullawal Adetunji ("Adetunji," DOH August 16, 2010), were all paid $ 9 per hour. Pollack Affirmation ¶ 22, and Defendants' Exh. 63.  The five RSAs with more seniority than Plaintiff were paid higher hourly wages.  Defendants' Exh. 63.  After meeting with Plaintiff, Pollack determined that although Plaintiff's hourly pay rate was in accordance with the standardized pay scale as determined by Avis's corporate human resources, and was not set by local management at the Buffalo Airport location, because Avis had increased the starting hourly rate for new employees since Plaintiff was hired in 2007, there had been some "wage compression" resulting in a smaller difference in pay between Plaintiff, with three years of seniority, and a newly hired employee at the current starting wage of $ 9 per hour as compared to the $ 8.50 hourly rate Plaintiff was paid as a newly hired employee.  To offset some of the wage compression, Pollack raised Plaintiff's hourly rate by $ .25 to $ 10.50, retroactive to 2009, with Plaintiff receiving $ 537 in retroactive pay.

Part of Plaintiff's compensation package included commissions paid for additional services the RSAs sold customers, such as upgrading the type of vehicle, and access to GPS and satellite radio.  Plaintiff claims she was never properly trained in "upselling," but learned the technique by observing other RSAs.  Even so, Plaintiff maintains that often she was not given credit for an upsale, and frequent assignments to later shifts and to work in Avis's kiosk deprived her of upselling opportunities.

**Scheduling**

Avis's Buffalo Airport location opened every day at 6:00 A.M., and was scheduled to close at 1:00 A.M., but occasionally remained open later to accommodate customers on delayed incoming flights.  Work hours for RSAs at Avis are assigned based on seniority and operational needs.  Plaintiff's regularly scheduled days off were Monday and Tuesday, although when short on staff – a common occurrence during the summer – RSAs often were required to work six days with one day off.  The RSA schedule was prepared by Lleras, but was not posted until approved by a manager three days prior to the start of the schedule to allow for the schedule to be adjusted for any personnel issues.  Lleras Statement[9] ¶¶ 1-2.  Plaintiff only addressed scheduling concerns with Lleras by written notes after the schedule had been posted.  *Id.* ¶ 2.

While Plaintiff was employed by Avis, five other RSAs had more seniority than Plaintiff including Munro, (DOH March 1, 1979), Warner (DOH January 26, 1987), Lleras (DOH December 24, 1988), Blask (DOH April 19, 1991), and Stachewicz (DOH August 12, 2000).  The five RSAs with more seniority than Plaintiff were given preference as to shift assignments, overtime opportunities, and vacation time.  In addition to having less seniority than the five other RSAs, Plaintiff's availability to work

---

[9] Defendants' Exh. 62.

was further limited by her own lack of personal transportation after her vehicle broke in 2009, requiring Plaintiff to rely on public transportation from her home in Niagara Falls, New York, to Avis's Buffalo Airport location, a route which generally required Plaintiff to take three buses.  Plaintiff's reliance on public transportation made it impossible for Plaintiff to work before 8:00 A.M., and because the last bus Plaintiff could take to return to Niagara Falls left the Buffalo Airport at 11:00 P.M., when Plaintiff was assigned to work beyond 11:00 P.M., Plaintiff often had no choice but to sleep in the public spaces of the Buffalo Airport or in Avis's rental cars if she was unable to arrange for a ride from a friend.  According to Plaintiff, Neudorf sometimes provided Plaintiff with the key to the administrative building where Plaintiff was able to sleep.  Plaintiff's Dep. Tr. Pt. 1[10] at 71-75.  Plaintiff maintains she was often assigned to work the closing shift from 4:00 P.M. to midnight, to accommodate customers arriving on the last planes which were scheduled to land around 11:30 P.M., but that she was often required to work later due to delays in scheduled airplane landings, sometimes as late as 4:00 A.M.  Plaintiff further maintains that when working past midnight, she was often the only RSA on duty, in violation of Avis's policy that at least two RSAs be on duty at all times.  When working by herself, Plaintiff sometimes was confronted with situations that required a manager's approval, necessitating Plaintiff to call a manager at home, but such calls were never well-received and were routinely ignored or resulted in anger directed toward Plaintiff.  As Plaintiff's seniority with Avis increased, Plaintiff worked fewer late or closing shifts and in 2010 her request not to work the closing shift was accommodated.  Plantiff's Dep. Tr. Pt. 1 at 77.

---

[10] References to "Plaintiff's Dep. Tr. Pt. 1" are to the transcript of the first day of Plaintiff's deposition, *i.e.*, November 20, 2013, filed as Defendants' Exh. 2.

When Plaintiff's father was dying, Plaintiff called in sick on January 14 and 15, 2009.  Plaintiff was excused from work for bereavement January 16, 17, and 18, 2009, followed by her regularly scheduled days off on January 19 and 20, 2009.  Plaintiff then had two weeks of vacation from January 21 through February 3, 2009, which two weeks included Plaintiff's regularly scheduled Mondays and Tuesdays off, returning to work on Wednesday, February 4, 2009.  Plaintiff's requests for the time off were granted by Neudorf.

According to Plaintiff, over the Labor Day weekend in 2010, she was scheduled to work 11 days without one day off.  Defendants, however, maintain Plaintiff worked only six days, had Labor Day off, and then worked another 6 days.  According to a copy of the relevant work schedule, filed by Plaintiff, Plaintiff's Exh. 11, Plaintiff was off Monday, August 30, 2010, and originally was not scheduled to work Tuesday, August 31, 2010, but signed up to work overtime that day, then worked the next five days, *i.e.*, Wednesday through Sunday, September 1 through 5, 2010, was off on Labor Day, Monday, September 6, 2010, worked an overtime shift on Tuesday, September 7, 2010, before working the next five days.  Plaintiff's Exh. 11.  During the 11 weeks period in which the Labor Day 2010 weekend fell, Plaintiff worked 82 hours of overtime, mostly covering late arriving flights, and also covering for employees who took vacation time and had medical leaves.

**Work Performance/Training**

Plaintiff maintains "Defendant managers have unfairly criticized Plaintiff's work performance."  Amended Complaint ¶ 51.  According to Plaintiff, at various times, a manager asked Plaintiff to step into Avis's car rental lot where the manager criticized

Plaintiff in a loud voice and within hearing range of other employees.  Plaintiff further maintains Defendants attempted to "derail Plaintiff's career through a combination of methods" including imposing on Plaintiff a "work plan" that was a pretext for Plaintiff's termination, *id.* ¶ 53, and failing to train Plaintiff in effective upselling strategies, thereby allowing Caucasian RSAs to reap commissions for upsells performed in Plaintiff's stead. *Id.* ¶¶ 55-57.  Plaintiff asserts she later trained herself to effectively upsell, which is borne out by records maintained by Defendants and on which monthly bonuses are awarded.  *Id.* ¶ 58.

Plaintiff also maintains that on one occasion when she was scheduled to work overtime, but became confused because another RSA signed his name indicating he wanted overtime causing Plaintiff to believe she did not have to work the shift, Neudorf yelled at Plaintiff for failing to report to work her scheduling shift, telling Plaintiff he had "just got rid of another African American girl for giving me lip."  Plaintiff's Dep. Tr. Pt. 1 at 92.

**Cash Transactions**

On August 15, 2010, Plaintiff prepared a rental agreement ("RA") for an Avis customer, with payment to be made by credit card.  The customer had agreed to add full insurance coverage on the rental vehicle for which Plaintiff would receive an "upsell" commission.  After Plaintiff left the sales counter, the customer returned to the sales counter, requesting to make payment in a combination of cash and credit.  Because Plaintiff was not then at the sales counter, another RSA, Stachewicz, handled the transaction which required voiding the RA prepared by Plaintiff, and preparing a new RA.  Because the original RA had included the full insurance coverage upsold by

Plaintiff, which was also included on the replacement RA prepared by Stachewicz, to ensure Plaintiff received full credit for the upsell, Stachewicz entered the transaction under Plaintiff's RSA identification number ("agent ID number"), entering the cash payment portion as a pre-payment, but failing to record the cash receipt in the "blue book" journal maintained for tracking cash receipts.   When reconciling the receipts at the end of her shift, Plaintiff noticed the cash receipt recorded under her agent ID number, but not recorded in the blue journal, which Plaintiff maintains was "a serious transgression of policy," Amended Complaint ¶¶ 63-64, and indicated Plaintiff had stolen $ 175 cash. *Id.* ¶ 65.  Plaintiff reported the transgression to management and Avis's headquarters.  Although both Chappell and Bishop explained to Plaintiff that Stachewicz had entered the replacement RA using – without Plaintiff's authorization – Plaintiff's agent ID number to ensure Plaintiff received credit for the upsale, Plaintiff maintains such explanation is "preposterous" in light of the "gravity of properly recording cash transactions," Amended Complaint ¶ 68, asserting the incident was part of a scheme to "precipitate" Plaintiff's discharge. *Id.*  By memorandum dated March 1, 2011, Chappell confirmed in writing that Plaintiff did not take $ 175 on August 15, 2010, nor had Plaintiff ever been accused of taking $ 175, and Plaintiff "is, and always has been, cleared of any wrongdoing concerning this contract."  Chappell Affidavit ¶ 26; Defendants' Exh. 79.

**Complaints**

### September 11, 2010 Ethics Hotline Call

On September 11, 2010, Plaintiff called Avis's Ethics and Compliance Hotline ("the Hotline"), provided for employees to report workplace-related issues ("Hotline

Call"). Plaintiff's complaints at that time were memorialized by Moussavian in a memorandum to Donnelly ("Moussavian Memorandum"),[11] and included that Plaintiff was claiming to have been denied training since 2008, yet had been with Avis long enough as to know how to handle certain transactions without formal training. Plaintiff claimed to have been scheduled to work 11 straight days without a day off, and to work at 6:00 A.M. even though Plaintiff, who relies on public transportation, cannot get to the Buffalo Airport location before 8:00 A.M. Plaintiff also complained that favoritism exhibited by Neudorf was disruptive to the workplace. Plaintiff asserted that on August 15, 2010, Stachewicz took out $ 175 cash in Green's name without Green having been made aware of it. According to Plaintiff, an upsale Plaintiff made to a customer on September 10, 2010, was changed, without her knowledge, by Neudorf. Plaintiff also alleged she was often assigned to work in the kiosk where she was not able to do upsales, thus negatively affecting Plaintiff's pay. Neither Neudorf nor Donnelly took Plaintiff's complaints seriously, and were trying to make Plaintiff's job difficult. In investigating Plaintiff's First Internal Complaint, Moussavian obtained statements from Neudorf, Bishop, and Chappell.

Neudorf explained that a review of the time and attendance records for all RSAs for the 11-week period from July 3 to September 15, 2010, showed neither that Plaintiff worked 11 days without a break, nor that Plaintiff was ever scheduled to work 11 straight days. Neudorf Statement[12] at 1. According to Neudorf, the summer scheduling required two to four shifts of mandatory overtime each week, which was bid by seniority and, in the absence of sufficient bids, was required to be worked by the RSA with the

---

[11] Plaintiff's Exh. 14; Defendants' Exh. 56.
[12] Defendants' Exh. 57.

lowest seniority.  *Id.*  At that time, Plaintiff was the second lowest in seniority among the

RSAs and, during the 11-week period reviewed by Neudorf, Plaintiff was required to

cover four overtime shifts, but for the seven remaining weeks, Plaintiff worked her

regular schedule, and worked a total of 82 hours overtime, most of which was covering

late arriving flights, and RSAs with both more and less seniority worked more overtime

hours than Plaintiff to cover other RSAs' vacations and medical leaves.  *Id.* at 1-2.

Neudorf also stated the hours worked in the kiosk are equally split between all the

RSAs, and Plaintiff's hours in the kiosk have not negatively impacted her sales because

Plaintiff usually has the most transactions and rental days.  *Id.* at 2.  With regard to the

September 10, 2010 upsale Plaintiff maintains Neudorf cancelled, Neudorf explained

that when Plaintiff made the upsale, Neudorf was working in the kiosk, and the

customer, upon receiving her vehicle, drove to the kiosk and complained that she did

not realize she was being charged $ 35/day for the upsale, thinking instead the

additional cost was only $ 5/day.  *Id.*  When Neudorf checked the RA, he noticed the

customer had not initialed the upsale or the rate and, having no paperwork on which to

rely as proof the customer understood the terms of the upsale, Neudorf changed the

RA, putting the customer in a full-size vehicle at the lower rental rate.  *Id.*  According to

Neudorf, had Plaintiff had the customer initial the new, upsale rate, Plaintiff would have

been permitted to keep the commission on the upsale.  *Id.*

Bishop concurred that Plaintiff was not scheduled to work and has never worked

11 straight days and was off on Labor Day, September 6, 2010, when an RSA with

more seniority volunteered to work.  Bishop Statement[13] ¶ 1.  Plaintiff worked six days

both prior to and after Labor Day because she was covering overtime shifts while other

---

[13] Defendants' Exh. 58.

RSAs were on vacation.  *Id.*  Bishop explained that he never spoke to Plaintiff regarding

her availability for the 6:00 A.M. shift ("the opening shift"), but that on one particular day

when Plaintiff had been scheduled to work the opening shift, an RSA with more seniority

chose not to work the opening shift, another RSA was scheduled to work the closing

shift the previous night and thus could not work the subsequent opening shift without

violating the requirement that RSAs have eight hours off between shifts, and the

remaining two RSAs were newly hired and not prepared to work the opening or closing

shifts.  *Id.* ¶ 2.   Bishop also denied that Plaintiff had ever been accused of taking cash

on August 15, 2010, *id.* ¶ 3, and that Plaintiff was scheduled to work the same number

of hours in the kiosk as the other RSAs, and had never addressed the issue with

Bishop.  *Id.* ¶ 4.

Chappell agreed with Bishop that Plaintiff was scheduled to work an opening shift

only because no other RSA was available, but that to accommodate Plaintiff's

transportation needs, Plaintiff was permitted to rent a vehicle from Avis for $ 36,

significantly less than the regular price of $ 100.  Chappell Statement[14] at 1.  Chappell

also concurred that Plaintiff was never accused of taking $ 175 in cash, that the cash

was never reported missing, that both Chappell and Bishop had explained to Plaintiff

that she was not being accused of taking the money, and that the transaction had been

completed by Stachewicz using Plaintiff's agent ID number only to ensure that Plaintiff

received credit for the upsale which Plaintiff had made on the original RA, and which

was continued on the replacement RA.  *Id.*  With regard to the upsale for which Plaintiff

maintains she never received credit, Chappell explained that Plaintiff had upsold a

Cadillac, but the customer did not realize until later, after Plaintiff's shift ended, that the

---

[14] Defendants' Exh. 59.

upsale would cost $ 25/day[15] and decided to return the Cadillac, receiving the full-size

rental vehicle the customer originally intended to rent.  *Id.*

### September 30, 2010 Letter

In a four-page letter to Moussavian dated September 30, 2010 ("September 30,

2010 Letter"),[16] concerning "Conduct and Business Principles," Plaintiff raised several of

the same complaints asserted in her Hotline Call, including that on August 15, 2010,

another RSA had made a cash transaction using Plaintiff's agent ID number, and that

the Shift Manager, Airport Manager, and City Manager had ignored Plaintiff's complaints

about the violation of Avis's policy, September 30, 2010 Letter at 1, that the starting pay

for newly hired RSAs was $ 9/hour whereas Plaintiff's starting pay was $ 8.50/hour, *id.*,

that Plaintiff had never been adequately trained, *id.* at 2, Plaintiff frequently found

negative notes in her locker, *id.*, the work schedule was always prepared so as to

benefit other RSAs, *id.* at 2-3, and that RAs on which Plaintiff had an upsale were

changed without Plaintiff's knowledge.  *Id.* at 3.  Newly asserted complaints included

that Plaintiff was often subjected to humiliating and loud talk by the Airport Manager,

Shift Managers, and City Manager, *id.*, that while working a kiosk shift one unspecified

"Friday," the Rovers[17] failed to efficiently move the rental vehicles, causing a back-up

near the kiosk and making it difficult for Plaintiff to match each customer with the

appropriate vehicle, *id.*, and that in July 2010, the employee meeting usually scheduled

for the first Thursday of each month was canceled and was held on Tuesday, July 13,

2010, without Plaintiff receiving any notice causing Plaintiff to miss the meeting and,

---

[15] Why Chappell asserts the upsale was $ 25/day, whereas Neudorf maintains it was $ 35/day, Neudorf
Statement at 2, is not explained in the record.
[16] Defendants' Exh. 51.
[17] A "Rover" is responsible for checking the rented vehicles in and out for the customers.

when Plaintiff asked Neudorf to see the minutes of the meeting, Neudorf failed to

provide them.  *Id.*  Plaintiff asked Moussavian to have each of Plaintiff's claims

investigated.  *Id.* at 4.

**Termination of Plaintiff's Employment**

On January 17, 2013, Plaintiff assisted a customer, Latora Atcherson

("Atcherson"), Neudorf Affidavit ¶ 34; Donnelly Affidavit ¶ 53, at the sales counter.

When Atcherson, who was accompanied by her 18-year old daughter, requested to pay

in cash, Plaintiff requested the daughter accompany Plaintiff into the rental office to

witness Plaintiff place the cash into the cash drawer in the safe.  Plaintiff maintains she

merely asked Atcherson's daughter to stand in the doorway to the office and watch

Plaintiff place the cash drawer in the safe, but that Plaintiff did not count any cash or

open the safe in front of the daughter, explaining that Plaintiff made the request only

after the co-workers Plaintiff had previously requested witness Plaintiff placing the cash

drawer in the safe had refused.  Plaintiff's Dep. Tr. Pt. 2[18] at 132-33, 136-37-41, 143.

Plaintiff maintains that although Avis does not maintain any policy requiring that the

placement of cash in the safe be witnessed, Plaintiff has seen other RSAs do so, *id.* at

134, 137, and Plaintiff had recently observed another Avis employee, one "Ja'Kee,"

being arrested for money that was supposed to be in Avis's safe, but was missing.  *Id.*

at 137-38.  Atcherson complained, in an e-mail dated January 24, 2013, to Neudorf

("Atcherson's Complaint"),[19] about Plaintiff's request to her daughter, explaining her

daughter felt extremely uncomfortable with the request, and that Plaintiff made

---

[18] References to "Plaintiff's Dep. Tr. Pt. 2" are to the transcript of the second day of Plaintiff's deposition, *i.e.*, May 28, 2014, filed as Defendants' Exh. 3.
[19] Defendants' Exh. 71.

numerous personal inquiries of the daughter while in the rental office and away from

Atcherson.  Specifically, Atcherson wrote

> Hello I'm writing to inform the experience I had with the airport location on Jan.
> 17, 2013.  My daughter was asked by an employee by the name of Priscilla
> Green to follow her in the office to watch her open a safe and counted the money
> to my daughter before placing it in the safe deposit box.  The made my daughter
> whom age is 18 feel very uncomfortable.  She was asking a lot of personal
> information about my daughter.  Which also made me feel uncomfortable.  I just
> wanted to share this information with your office so that you are aware of the
> things that occurred on this date.  Thank you.  [*sic*]

Atcherson's Complaint.

Upon receiving Atcherson's Complaint, Neudorf questioned Plaintiff about the incident

and Plaintiff admitted calling Atcherson's daughter to the back room to witness Plaintiff

place the cash in the safe, and also admitted she had never previously asked anyone to

witness her placing cash in the safe.  Neudorf reported the incident to Dahianara Moran

who, in late 2012, had assumed responsibility for Avis's human resources issues at

numerous locations including, *inter alia*, at the Buffalo Airport.  On January 31, 2013,

Moran suspended Plaintiff with pay and commenced an investigation of the incident

which revealed that Plaintiff's actions in requesting a customer's child to accompany her

into Avis's office, witness Plaintiff count cash, and place the cash into the office safe,

which Plaintiff possibly opened in the child's presence, were not only not required under

Avis's protocol, practices, or procedures, but also violated Avis's cash-handling and

security protocol, placing both Avis and Atcherson's daughter at risk.  Contrary to

Plaintiff's actions on January 17, 2013, Avis's protocol only requires an RSA, at the end

of each shift, to place the cash drawer into the safe and complete a document titled

"Cash Reconciliation," showing how much money is in the drawer when placed in the

safe.  The Cash Reconciliation form is required to be signed only by the RSA, and there

is no line for any witness signature. By letter to Moran dated February 1, 2013 ("February 1, 2013 Letter"),[20] Plaintiff asserted that other non-employees, including family members and employees of competing car rental agencies, had been permitted in the office without repercussions. Moran's investigation, however, showed no evidence of any non-employee ever being present in the office when cash was being counted or the safe was open, nor were any of the non-employees strangers such as customers or children of customers. Finding no merit for Plaintiff's actions, Moran recommended to Robert Calderone ("Calderone"), Avis's Regional Operations Manager for New England whose approval was required for terminating an employee, that Plaintiff's employment be terminated effective February 6, 2013. Calderone agreed and, by letter dated February 6, 2013 ("termination letter"),[21] Moran advised Plaintiff her employment with Avis was terminated based on Plaintiff's failure to properly secure cash, creating a significant security breach and placing Avis's assets, Plaintiff, and Plaintiff's co-workers at risk.

## DISCUSSION

### 1.    Motion for Court to Accept Exhibits and Motion to Strike Late-Filed Exhibits

Although Plaintiff's response in opposition to summary judgment was originally to have been filed by September 30, 2015, in a Decision and Order filed October 5, 2015 (Dkt. 179), that deadline was extended to November 4, 2015. Accordingly Plaintiff filed on November 4, 2015, Plaintiff's Response in which she also requested, based on an unspecified "family emergency," permission to submit exhibits on November 16, 2015.

---

[20] Defendants' Exh. 73.
[21] Defendants' Exh. 8.

Plaintiff's Response at 6.  By letter dated November 15, 2015, and filed November 16, 2015 (Dkt. 181), Plaintiff requested extending the deadline for filing her exhibits to November 23, 2015, to allow Plaintiff to attend to her child who was having heart surgery.  On November 20, 2015, Plaintiff filed her motion seeking an extension of time to file her exhibits in opposition to summary judgment, which Defendants, by letter to the undersigned dated November 20, 2015 (Dkt. 182), opposed unless their time to reply in further support of summary judgment was also extended.  By Text Order entered November 23, 2015 (Dkt. 183), Plaintiff was given until December 7, 2015, to file her exhibits, and the deadline for Defendants' reply was extended to December 21, 2015. Plaintiff then requested, and was granted, five extensions of time to file her response in opposition to summary judgment, including Text Order entered December 4, 2015 (Dkt. 186), Text Order entered December 21, 2015 (Dkt. 187), Text Order entered December 23, 2015 (Dkt. 188), Text Order entered December 30, 2015 (Dkt. 189), and Text Ordered entered January 5, 2016 (Dkt. 192), in which Plaintiff was given until January 11, 2016 to file her exhibits to Plaintiff's Response opposing summary judgment, with Defendants' deadline for filing any reply extended to January 29, 2016.  Plaintiff did not file any exhibits by the January 11, 2016 deadline, however, and on January 27, 2016, Defendants filed Defendants' Reply.  On January 29, 2016, Plaintiff manually filed a volume of exhibits with Plaintiff's Motion for Late Filing, which Defendants, on February 12, 2016, moved to strike.  Plaintiff then requested, and received, seven extensions of time to file her response in opposition to Defendants' Cross-Motion and in further support of Plaintiff's motion, with Plaintiff's final deadline set at September 13, 2016, and two subsequent motions seeking further extensions of time denied by the

undersigned. *See* Text Order entered September 14, 2016 (Dkt. 220), and Text Order entered September 20, 2016 (Dkt. 222).  Meanwhile, on June 1, 2016, Plaintiff filed a document titled "Plaintiff's Opposition to 'Motion to Strike' & 'Cross Motion,'" but never filed any reply in further support of Plaintiff's Motion for Late Filing.

In support of Plaintiff's Motion for Late Filing, Plaintiff argues for an expedited hearing regarding the reassignment of this action from Senior District Judge Richard J. Arcara to District Judge Lawrence J. Vilardo, an expedited trial date, $ 1,000,000 in punitive damages,[22] and for the court to accept Plaintiff's exhibits filed in opposition to summary judgment after the deadline for such filing.  Plaintiff does not make any specific argument in support of her request that the court accept her late-filed exhibits, nor in support of her request for a hearing regarding the reassignment of this action from one district judge to another, for an expedited trial date, or for the $ 1,000,000 in punitive damages Plaintiff seeks; rather, Plaintiff argues that each time she was granted an extension of time to file her exhibits in opposition to summary judgment, Defendants' deadline for filing their reply was also extended.  Plaintiff's Response – Cross-Motion ¶ 13.  In support of their Cross-Motion seeking to strike Plaintiff's Motion for Late Filing, Defendants maintain that Plaintiff's late-filed exhibits were filed after Defendants filed Defendants' Reply – Summary Judgment, which should have been the last filing with respect to Defendants' summary judgment motion, and the court's consideration of the late-filed exhibits will be prejudicial to Defendants.  Defendants' Memorandum – Cross-Motion to Strike at 5-10.  Alternatively, Defendants argue that should the court accept Plaintiff's late-filed exhibits, Defendants should be given time to file a further reply to

---

[22] Plaintiff's request for $ 1,000,000 in punitive damages is also included in her Amended Complaint. Amended Complaint, Prayer for Relief ¶ B.

avoid undue prejudice.  *Id.* at 10-11.  Defendants further assert that Plaintiff's demands

for an expedited hearing and an expedited trial date, have been made multiple times

before, and rejected by the court, as inconsistent with the court's practice of setting

hearings and trial dates after completing dispositive motion practice, and that the cover

sheet on which Plaintiff asserts her demand for $ 1,000,000 in punitive damages is

intended only for informational purposes and is not a pleading upon which relief can be

granted, let alone there has been no finding of liability against Defendants.  Piper

Affirmation ¶¶ 17-20.  In further support of Plaintiff's Motion for Late Filing, Plaintiff

reiterates her requests for an expedited hearing, scheduling of trial, and $ 1,000,000

punitive damages.  Plaintiff's Reply Affirmation ¶¶ 3, 5-6.  Defendants, in further support

of Defendants' Cross-Motion to Strike, assert Plaintiff's response to Defendants' Cross-

Motion to Strike was untimely and should not be considered, Defendants' Reply –

Cross-Motion to Strike at 2-4, Plaintiff has failed to identify any justifiable reason for her

late submissions or to demonstrate Defendants will not be prejudiced by their

consideration, *id.* at 5-8, and again requested permission to file a further reply if

Plaintiff's late-filed submissions are considered.  *Id.* at 9.

     With regard to Plaintiff's request for an expedited hearing and scheduling of trial,

as Defendants assert, Piper Affirmation ¶¶ 17-20, such requests are premature prior to

the resolution of dispositive motion practice.  Furthermore, Plaintiff's request for punitive

damages, which can only be awarded by a jury following trial on the issues, is also not

properly before the court.  Accordingly, Plaintiff's Motion for Late Filing is DENIED as to

these requests.

Inasmuch as Plaintiff requests the court accept her admittedly untimely filed exhibits opposing Defendants' Motion for Summary Judgment, although "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), Plaintiff's *pro se* status does not absolve her from the obligation to comply with the requirements of court orders issued.  *See*, *e.g.*, *Barclay v. Doe*, 207 Fed.Appx. 102, 104 (2d Cir. Dec. 5, 2006) ("'while *pro se* litigants may in general deserve more lenient treatment than those represent by counsel, all litigants, including *pro ses*, have an obligation to comply with court orders.  When they flout that obligation they, like all litigants, must suffer the consequences of their actions.'" (quoting *McDonald v. Head Criminal Court Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988)).  Even if the court were inclined to consider Plaintiff's belatedly-filed exhibits in ruling on Defendants' Motion for Summary Judgment, the court's plain review of said exhibits establishes they are either irrelevant to Plaintiff's claims, *see*, *e.g.*, Plaintiff's Exh. 2 (including, *inter alia*, a copy of Plaintiff's Associate's in Applied Science in Business Administration diploma issued by Niagara County Community College; list of Plaintiff's goals and aspirations, photographs of Plaintiff's church and community children's choir, a poem authored by Plaintiff, and photographs of Plaintiff's family (parents and siblings)), Exh. 7 (including, *inter alia*, a portrait of Plaintiff's parents, Plaintiff's father's obituary published in local newspaper, a copy of a Father's Day card from Plaintiff to her father), Exh. 22 (copies of birthday greeting cards and other sentiments from Plaintiff to co-workers), and Exh. 30 (letters from Avis Chairman and CEO Ronald L. Nelson dated December 4, 2008, and January 8, 2010, to all employees discussing budget concerns and strategy for ensuring Avis's

continued economic success); duplicative of exhibits filed by Defendants, *see*, *e.g.*, Exh. 22 (February 6, 2013 termination letter, also filed as Defendants' Exh. 8), illegible, *see*, *e.g.*, Exh. 16 (portions of work schedules), Exh. 20 (portions of handwritten notes), Exh. 22 (handwritten note by unidentified author with "Val" written across top of page, and handwritten note, author unidentified, with "Mtg for D & Chris N. 1/15/08" written at top of page); or fail to establish any genuine issue of material fact to avoid summary judgment.  *See*, *e.g.*, Exh. 20 (June 15, 2012 memorandum from Plaintiff to Donnelly complaining about Plaintiff's unidentified "Manager being impatient and short tempered" with Plaintiff, including "publicly taunt[ing] and humiliate[ing]" Plaintiff, "due to some reason [Plaintiff] is unaware of with him," but failing to attribute such manager's alleged actions to Plaintiff's race), Exh. 21 (handwritten note "Give Customer F Class car per Joe Donnelly, Management Favoritism Special Customers," with no attribution of such "favoritism" to any race; July 21, 2010 memorandum from Plaintiff to Neudorf complaining Plaintiff did not receive adequate notice about change in time for monthly employee meeting, resulting in Plaintiff missing the meeting; and December 3, 2008 letter from Neudorf informing Plaintiff had performed five credit overrides in November 2008, in violation of company policy and advising Plaintiff continued violations would result in further disciplinary action which could include termination), Exh. 22 (August 6, 2010 memorandum from Plaintiff to Donnelly complaining about scheduling issues, but not attributing any dispute to racial disparity), Exh. 24 (four-page, single-spaced memorandum dated September 30, 2010, from Plaintiff to Moussavian making numerous complaints including the $ 175 cash incident, alleged underpayment of wages, scheduling, negative notes left in Plaintiff's locker critiquing Plaintiff's work,

alleged tampering with rental agreements to deprive Plaintiff of credit for upsells,

managers routinely speaking to Plaintiff using loud, humiliating tone of voice, but no

attribution of any such conduct to Plaintiff's race).  Three pages of Plaintiff's Exh. 26,

further denominated by Bates Stamp DEF000770, DEF000772, and DEF000774, are

type-written statements that appear to capture Plaintiff's thoughts with respect to her

myriad of complaints regarding her employment with Avis, in which the alleged

egregious conduct is attributed to Plaintiff's race.  Not only is the author of these pages

not identified, but the pages contain no dates, nor is there any indication that any of the

complaints therein were ever shared with any Avis supervisor or manager.[23]  Although

in Plaintiff's Affirmation, Plaintiff argues that some of her exhibits demonstrate racial

disparity, *see*, *e.g.*, Plaintiff's Affirmation at 102 (explaining that the third paragraph on

page 2 of Plaintiff's Exh. 26, December 10, 2010 letter to Pollack, demonstrates that

Caucasian RSAs are scheduled for two to three days off each week to spend time with

their families), nothing within such exhibits is consistent with Plaintiff's descriptions.

Significantly, absent from all of Plaintiff's exhibits is any indication that Plaintiff ever

complained of racial discrimination prior to filing her EEOC complaint in September

2012.

Accordingly, Plaintiff's Motion for Late Filing is DENIED; Defendants' Motion to

Strike is GRANTED.

**2.    Summary Judgment**

Defendants seek summary judgment on all of Plaintiff's claims, and Plaintiff

moves to dismiss Defendants' Motion for Summary Judgment.  Summary judgment of a

---

[23] Plaintiff's Affirmation accompanying Plaintiff's Exhibits, although lengthy and quite detailed, is devoid of any description of these three pages.

claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379

(2d Cir. 1992)).   Once a party moving for summary judgment has made a properly

supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor.   *Goenaga v. March of Dimes*

*Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).   "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine'

issues for trial."   *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.

1996).   "An issue of fact is genuine and material if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."   *Cross Commerce*

*Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint*

*Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

## 3.    Employment Discrimination

In the instant case, Plaintiff specifically claims violations of Title VII, § 1981,[24] and

NYSHRL when Defendants subjected Plaintiff to disparate treatment based on her race,

and a racially hostile work environment, and then retaliated against Plaintiff for

complaining about the alleged disparate treatment and hostile work environment by

stealing her upsale commissions, harassing Plaintiff, and terminating Plaintiff's

employment.[25]  Despite some differences in the types of discrimination each prescribes,

---

[24] Employment discrimination claims under § 1981 include both claims of employment discrimination
brought both by employees working under contract and at-will employees.  *Lauture v. International
Business Machines Corp.*, 216 F.3d 258, 260-61 (2d Cir. 2000).
[25] Defendants do not assert in their answer to the Amended Complaint, nor do Defendants argue in
support of summary judgment, that Plaintiff failed to timely exhaust administrative remedies relevant to
her Title VII claims and, as such, have waived that affirmative defense.  *See Fowlkes v. Ironworkers Local
40*, 790 F.3d 378, 384-85 (2d Cir. 2015) (holding Title VII administrative exhaustion requirement is not a
jurisdictional requirement but, rather, merely a precondition to suit and, thus, if not raised is waived).
Exhaustion of administrative remedies, however, is not a prerequisite to Plaintiff's § 1981 or NYSHRL
claims.  *See Ross-Caleb v. City of Rochester*, 512 Fed.Appx. 17, 17-18 (2d Cir. Feb. 19, 2013) (NYSHRL
employment discrimination claim "does not require exhaustion of administrative remedies prior to bringing

claims of racial discrimination are analyzed "identically under Title VII and § 1981 in

other respects." *Village of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016).

Further, "discrimination claims under the [NYS] HRL are evaluated using the same

analytical framework used in Title VII actions." *Lore v. City of Syracuse*, 670 F.3d 127,

169 (2d Cir. 2012).  Plaintiff's disparate treatment and retaliation claims are analyzed

pursuant to the burden-shifting test established by *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802 (1973) ("*McDonnell Douglas*").[26]  *See Vivenzio v. City of Syracuse*,

611 F.3d 98, 106 (2d Cir. 2010) (applying *McDonnell Douglas* burden-shifting

framework to employment discrimination claims brought under Title VII and § 1981

because "[t]he substantive standards applicable to claims of employment discrimination

under Title VII, [ ] are also generally applicable to claims of employment discrimination

brought under § 1981 . . . .").  The *McDonnell Douglas* burden-shifting analysis "is an

evidentiary standard, not a pleading requirement." *Liebowitz v. Cornell University*, 445

F.3d 586, 591 (2d Cir. 2006) (citing *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 410

(2002)).  Under the *McDonnell Douglas* burden-shifting analysis, the plaintiff bears the

initial burden of establishing a *prima facie* case of employment discrimination, after

which the burden shifts to the employer to establish a legitimate, nondiscriminatory

reason for the adverse employment action, following which the burden shifts back to the

plaintiff to establish such legitimate, non-discriminatory reason was mere pretext for

illegal discrimination. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  Whether an

action is brought under Title VII, § 1981, or NYSHRL, a plaintiff can meet her burden of

---

a lawsuit"), and *Holt v. Continental Group, Inc.*, 708 F.2d 87, 89-90 (2d Cir. 1983) (§ 1981 employment
discrimination claim "is not subject to an [administrative] exhaustion requirement.").
[26] As discussed below, Discussion, *infra*, at 48-50, Plaintiff's hostile work environment claims are subject
to a different analysis.

proof to establish employment discrimination through either direct or circumstantial

evidence. *Coward v. Town and Village of Harrison*, 665 F.Supp.2d 281, 306 (2d Cir.

2009) (Title VII and § 1981); *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir. 2001)

(NYSHRL).

### A.    Disparate Treatment

#### 1.    *Prima Facie* Case

To establish a *prima facie* case of employment discrimination based on disparate

treatment, Plaintiff must demonstrate (1) she belonged to a protected class; (2) she was

qualified for the position she held; (3) she was subjected to an adverse employment

action; and (4) the adverse action occurred under circumstances giving rise to an

inference of discrimination. *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (citing

*Ruiz v. County of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010)).  In the instant case,

Defendants concede that Plaintiff can establish the first two prongs as an African-

American who satisfactorily performed her job as an RSA, Defendants' Memorandum –

Summary Judgment at 4, yet maintain that aside from the termination of her

employment, the employment actions Plaintiff asserts were adverse were not adverse

as a matter of law, or the record is devoid of any evidence that such actions occurred

under circumstances giving rise to an inference of discrimination based on Plaintiff's

race. *Id.*  In opposition to summary judgment, Plaintiff essentially reiterates her

complaints that Defendants violated Plaintiff's rights with respect to her employment by

subjecting Plaintiff to racial harassment and a racially hostile work environment,

Plaintiff's Response at 2-3, including denying Plaintiff leave under the Family Medical

Leave Act[27] to permit Plaintiff to care for her sick father, unfairly scheduling Plaintiff and routinely denying Plaintiff requested vacation time, paying Plaintiff a lower wage than that to which Plaintiff was entitled, intentionally losing Plaintiff's paycheck rendering Plaintiff's financial survival difficult, and wrongfully terminating Plaintiff for the same conduct in which other Avis employees had engaged without sanctions.  *Id.* at 4-5.  In support of her argument, Plaintiff relies on a case, "*People of North Carolina v. Avis Rent-A-Car,*"[28] in which, according to Plaintiff, an Avis Rent-A-Car franchisee paid a settlement of $ 3.3 million for requiring higher credit card limits and more proof of employment for prospective African-American customers.  *Id.*  Plaintiff also maintains that most of the caselaw on which Defendants rely in support of summary judgment have been overturned and, as such, are no longer good law supporting Defendants' Motion for Summary Judgment.  *Id.* at 5-6 and 9-18 ("Defendant's Table of Authorities Shepardizing – Negative Treatment").  In further support of summary judgment, Defendants argue Plaintiff has failed to point to any evidence of a disputed issue of material fact establishing any adverse employment action or giving rise to any inference of discrimination.  Defendants' Reply – Summary Judgment, at 2-6.

### a.   Adverse Employment Action

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  "Examples of a change include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a

---

[27] Neither in her Complaint nor in the Amended Complaint has Plaintiff alleged any claim under the Family Medical Leave Act.

[28] Plaintiff provides no citation for the case, nor has the court's research found any case consistent with Plaintiff's description of the case emanating from any federal or state court.

less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Sanders v. N.Y.C. Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "An adverse employment action is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F.Supp.2d 167, 176 (E.D.N.Y. 2013) (quoting *Brown*, 673 F.3d at 150). In the instant case, although Defendants agree that the termination of Plaintiff's employment is an adverse employment action, Defendants dispute that any other actions of which Plaintiff complains qualifies as adverse as a matter of law, including receiving verbal and written reprimands and criticism, being denied a preferred schedule, Plaintiff's hourly pay rate, and Defendants' failure to adequately train Plaintiff for certain job responsibilities. Defendants' Memorandum – Summary Judgment at 5-9. Plaintiff offers no substantive argument in opposition to summary judgment on this point.

With respect to Plaintiff's assertions that she received excessive scrutiny and criticism of her work, "'[c]ourts in this circuit have found that reprimands . . . and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.'" *Washington v. Securitas Security Services USA, Inc.*, 2016 WL 6875706, at * 5 (W.D.N.Y. Nov. 22, 2016) (quoting *Dauer v. Verizon Communications, Inc.*, 613 F.Supp.2d 446, 461 (S.D.N.Y. 2009), *vacated on other grounds sub nom.*, *Pucino v. Verizon Wireless Communications, Inc.*, 618 F.3d 112 (2d Cir. 2010)). Rather, "criticism of an employee (which is part of training and necessary to allow employees to develop,

improve and avoid discipline) is not an adverse employment action." *Weeks v. New York State Division of Parole*, 273 F.3d 76, 86 (2d Cir. 2001) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442-43 (7th Cir. 1996) (plaintiff's negative job evaluation, without more, does not establish adverse employment action)), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Nor does rudeness, including being yelled at, constitute an adverse employment action. *Missick v. City of New York*, 707 F.Supp.2d 336, 348 n. 5 (E.D.N.Y. 2010) (citing cases). Here, Plaintiff makes no claim, nor does the record contain any evidence, that the alleged criticism by Defendants resulted in any negative employment action.

Nor does Defendants' failure to provide Plaintiff with her desired work schedule, including scheduling Plaintiff to work fewer closing shifts, not requiring Plaintiff to start work before 8:00 A.M., giving Plaintiff her preferred days off and always scheduling Plaintiff for two days off each week, constitute an adverse employment action supporting an employment discrimination claim. *See*, *e.g.*, *Seale v. Madison County*, 929 F.Supp.2d 51, 75 (N.D.N.Y. 2013) (holding an unwanted schedule change does not constitute an adverse employment action); *Nicholls v. Brookdale University Hosp. and Medical Center*, 2005 WL 1521239, at * 31 (E.D.N.Y. June 22, 2005) (holding unfavorable work schedule, representing diminution in prestige and allowing for fewer opportunities to rotate between challenging and less challenging work on a regular basis, did not constitute an adverse employment action), *aff'd*, 205 Fed.Appx. 858 (2d Cir. 2006). A work schedule amounts to an adverse employment action for purposes of establishing disparate treatment only where the schedule change implicates a change in duties, compensation, or benefits. *See*, *e.g.*, *Feingold v. New York*, 366 F.3d 138, 152-

53 (2d Cir. 2014) (assignment of "a disproportionately heavy workload" can constitute an adverse employment action); and *Seale*, 929 F.Supp.2d at 75 ("The inconvenience caused by a change in work location and hours, without an accompanying allegation that such changes amounted to a demotion, is not enough to meet the definition of an adverse action for purposes of a discrimination claim.").  Here, aside from arguing she was often given an inconvenient schedule – even a schedule that, because Plaintiff at times was without reliable transportation, sometimes required Plaintiff to sleep in public areas of the Buffalo Airport or in unrented Avis vehicles[29] – Plaintiff does not assert, nor point to any evidence, that such scheduling constituted a demotion, required Plaintiff to perform an inordinate amount of work, or resulted in more job duties, less pay, or fewer benefits.  Insofar as Plaintiff maintains the shifts to which she regularly was assigned typically offered fewer upsale opportunities than the busier day shifts worked by Caucasian RSAs, Amended Complaint ¶ 59, Defendants submit evidence that Plaintiff was often the top RSA is terms of upsales.  Neudorf Statement[30] at 2 (explaining that although Plaintiff maintains working in the kiosk hurt her upsales, work in the kiosk is equally split among all RSAs and Plaintiff "usually is in the top for the most transactions and rental days").  Significantly, Plaintiff does not challenge the accuracy of this evidence.  Accordingly, none of the scheduling of which Plaintiff complains qualifies as an adverse employment action.

---

[29] It is not clear from the record how often Plaintiff had to resort to sleeping at the Buffalo Airport – either in public areas or in unrented Avis vehicles; rather, Plaintiff, who commenced working for Avis on May 15, 2007, explains only that her vehicle broke the day after her father died in January 2009.  Plaintiff's Dep. Tr. Pt. 1 at 71-72.  In 2010, Plaintiff's schedule was changed to accommodate the bus schedule.  *Id.* at 77.  Meanwhile, although Plaintiff did not recall the exact number of times she was forced to remain at the Buffalo Airport after the closing shift, she estimated it was more than 20 times, while other times she arranged for a ride from a friend, or stayed at a friend's home, and that Neudorf sometimes gave Plaintiff the key to the administrative building where Plaintiff could sleep.  *Id.* at 75-79.
[30] Defendaants' Exh. 57.

Insofar as Plaintiff maintains Defendants failed to adequately train her for effective upselling, Amended Complaint ¶ 57, and with regard to updated company protocols, *id.* ¶ 82, "employer-provided training is a benefit under Title VII protection," *Ani v. IMI Sys.*, 2002 WL 1888873, at * 6 (S.D.N.Y. Aug. 15, 2002), such that the "[d]enial of training can constitute an adverse employment action where it bears on either plaintiff's opportunity for professional growth and career advancement or directly on plaintiff's compensation." *Hill v. Rayboy-Brauestein*, 467 F.Supp.2d 336, 352 (S.D.N.Y. 2006) (quotation omitted); *see also Little v. NBC*, 210 F.Supp.2d 330, 384 (S.D.N.Y. 2002) (noting "denial of training" may constitute an adverse employment action).  In contrast, requiring an employee to attend training generally is not considered an adverse employment action.  *See Davis v. Joseph J. Magnolia, Inc.*, 815 F.Supp.2d 270, 276 (D.D.C. 2011) (requiring plaintiff to attend safety training course not adverse employment action).  In the instant case, not only does Plaintiff fail to specify what training she maintains she was denied, but Plaintiff also points to no material harm resulting from any failure to Defendants to properly train Plaintiff.  *Hill*, 467 F.Supp.2d at 352-53 (holding no adverse employment action is established where plaintiff employee is unable to demonstrate material harm from alleged denial of training).  In contrast, Neudorf described Plaintiff as usually being "in the top" for rentals and upsales.  Neudorf Statement at 2.   Accordingly, the record does not establish Plaintiff suffered any adverse employment action based on a failure to train.

Although Plaintiff's assertion that she was paid only $ 8.50 per hour, which was less than the $ 9.00 hourly wage Neudorf promised to pay when Plaintiff was hired, and less than other newly hired employees were paid, Amended Complaint ¶¶ 24-27, would

constitute an adverse employment action, *see Bazemore v. Friday*, 478 U.S. 385, 395-96 (1986) (holding pay disparities between African-American employee and similarly situated Caucasian employee is basis for Title VII employment discrimination action), the record is devoid of any evidence establishing that Plaintiff was, in fact, paid less than other newly-hired RSAs.  Rather, as Defendants explain, in November 2010, Plaintiff complained to Pollack that newly hired RSAs were earning $ 9.00 per hour, in contrast to the $ 8.50 per hour Plaintiff was paid upon commencing employment with Avis in 2007.  Pollack Affidavit ¶ 20-22.  Pollack reviewed the hourly wages then in effect for RSAs, observing that newly-hired RSAs, who were Caucasian, were paid $ 9.00 per hour, and Plaintiff was then paid $ 10.25 per hour.  *Id.*  Pollack explained to Plaintiff that since she had been hired three years earlier, the starting hourly wage rate for RSAs had increased from $ 8.50 to $ 9.00, resulting in some "wage compression." *Id.* ¶ 23.  To offset some of the wage compression, Pollack raised Plaintiff's hourly rate by $ .25 to $ 10.50, retroactive to 2009, with Plaintiff receiving $ 537 in retroactive pay. *Id.*  Plaintiff does not dispute the accuracy of this explanation.  The record thus is devoid of any evidence that Plaintiff was actually paid less than other RSAs sufficient to create a material issue of fact on this allegation requiring trial.

Accordingly, the only adverse employment action suffered by Plaintiff was the February 6, 2013 termination of her employment, which occurred almost two years after Plaintiff commenced this action on March 25, 2011, and, as such, logically cannot support Plaintiff's disparate treatment claims.  Summary judgment should therefore be GRANTED on Plaintiff's disparate treatment claims based on Plaintiff's failure to establish any adverse employment action.

### b.    Inference of Discrimination

The court thus considers whether the only adverse employment action alleged by Plaintiff, *i.e.*, the termination of her employment, occurred under circumstances giving rise to an inference of unlawful discrimination.  The requisite "inference of discrimination" requires some basis for finding an adverse employment action was motivated by the plaintiff's membership in a protected class, as opposed to some lawful motive, including personal dislike, or poor work performance, although "[d]irect evidence of discrimination is not necessary . . . .  If there is sufficient circumstantial evidence on which to build a case, it is for the jury to determine what inferences can be drawn from that evidence." *Lizardo v. Denny's Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) (internal citations omitted).  "[A] showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group . . . is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation omitted).  "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz*, 609 F.3d at 493-94 (quotations omitted).  "[T]he standards for comparing conduct requires a reasonably close resemblance to the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.'" *Id.* at 494 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).  "[T]he comparator must be similarly situated to the plaintiff 'in all material respects.'" *Id.* (quoting *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  "[T]o defeat summary judgment, the plaintiff's admissible evidence

must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing *Stern v. Trustees of Columbia*, 131 F.3d 305, 312 (2d Cir. 1997)). In the instant case, Plaintiff fails to point to any evidence that the asserted adverse employment action, specifically, the termination of Plaintiff's employment, occurred under circumstances giving rise to an inference of racial discrimination.

In particular, Plaintiff points to no Caucasian employees who were not disciplined for engaging conduct similar to that for which Plaintiff's employment was terminated, *i.e.*, the January 17, 2013 incident involving customer Atcherson and her daughter. Although Plaintiff maintains other employees invited non-employees into Avis's back office yet were not terminated, the circumstances under which the invitees were in the office were not the same as those for which Plaintiff was terminated. In particular, the few occasions described by Plaintiff, Amended Complaint ¶ 94, involved close family members and friends – rather than complete strangers such as customers – who stopped to visit with another employee. Moran Affidavit ¶ 15. Nothing in the record indicates that company business was conducted in the office in the presence of such invitees, that the safe was opened, or that any cash was placed in or removed from the safe during such visits. *Id.* That the invitees were well-known negates the possibility that their presence posed any danger to the other Avis employees or to the security of Avis's property. *Id.*

Plaintiff also fails to point to any evidence of racially derogatory comments aside from a single comment she attributes to Neudorf, Plaintiff's Dep. Tr. Pt. 1 at 91-93

(asserting Neudorf yelled at Plaintiff for missing her shift, stating that he had "just got rid of another African American girl for giving me lip"), and which Neudorf denies making. Neudorf Affidavit ¶¶ 58-62.  Even if considered, evidence of a single stray remark generally is insufficient to establish an inference of discrimination.  *See Carlton v. Mystic Transp. Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (holding plaintiff's discharge from employment, accompanied by manager's comment suggesting the plaintiff should retire, established inference of age-based discrimination).  Significantly, the comment Plaintiff attributes to Neudorf was not accompanied by any discipline, even though Plainitff "could have been disciplined for her no-call, no-show on this occasion," Neudorf Affidavit ¶ 62, and was completely unrelated to the termination of Plaintiff's employment. Nor was Neudorf involved in the determination to terminate Plaintiff's employment, that decision having been made by Calderone, upon recommendation of Moran who investigated the incident.  Moran Affidavit ¶¶ 11-15.  Thus, no evidence connects Neudorf's alleged comment to Plaintiff's discharge.

Accordingly, Plaintiff cannot make out a *prima facie* case of employment discrimination based on disparate treatment in violation of Title VII, § 1981, or NYSHRL, and summary judgment should be GRANTED in favor of Defendants on these claims.

### 2.    Legitimate, Nondiscriminatory Reason for Adverse Action

Even assuming, arguendo, Plaintiff is able to establish that the termination of her employment occurred under circumstances giving rise to an inference of discrimination, Defendants have articulated a legitimate, nondiscriminatory reason for the action. *Hicks*, 593 F.3d at 164.  In particular, the record establishes that upon receiving Atcherson's Complaint on January 24, 2013, Neudorf asked Plaintiff about the January

17, 2013 incident, but Plaintiff gave no credible explanation for requesting the daughter of a customer to accompany Plaintiff to the back office to witness Plaintiff place cash in the safe.  Neudorf Affidavit ¶¶ 34-35.  Neudorf notified Moran of Atcherson's Complaint, *id*. ¶ 36, which Moran investigated, placing Plaintiff on paid leave on January 31, 2013, pending the investigation's completion.  Moran Affidavit ¶¶ 11-15.  Moran's investigation revealed that Plaintiff's actions in requesting a customer's child to accompany her into Avis's back office, witness Plaintiff count cash, and place the cash into the office safe, which Plaintiff possibly opened in the child's presence, were not only not required under Avis's protocol, practices, or procedures, but also violated Avis's cash-handling and security protocol, placing both Avis and Atcherson's daughter at risk.  *Id*. ¶ 14.  Rather, contrary to Plaintiff's unexplained actions of January 17, 2013, Avis's protocol only requires an RSA, at the end of each shift, to place the cash drawer into the safe and complete a document titled "Cash Reconciliation," showing how much money is in the drawer when placed in the safe, the Cash Reconciliation form is required to be signed only by the RSA, and there is no line for any witness signature.  *Id*.  Although Plaintiff, in her February 1, 2013 Letter to Moran, asserted that other non-employees, including family members and employees of competing car rental agencies, had been permitted in the office without repercussions, Moran's investigation showed the circumstances of such situations were markedly different, including that no non-employee was ever present in the office when cash was being counted or the safe was open, nor were any of the non-employees strangers such as customers or children of customers.  *Id*. ¶ 15. In the absence of any merit supporting Plaintiff's actions, Moran recommended to Calderone that Plaintiff's employment be terminated effective February 6, 2013, and

Calderone agreed.  As such, the record supports that Plaintiff's employment was terminated on February 6, 2013 for legitimate, nondiscriminatory reasons, to wit, based on Plaintiff's failure to properly secure cash, creating a significant security breach and placing Avis's assets, Plaintiff, and Plaintiff's co-workers at risk.  *See Speiss v. Xerox Corp.*, 481 Fed.Appx. 450, 460-61 (2d Cir. Sept. 25, 2012) (violation of employer's e-mail policy was legitimate, nondiscriminatory reason for termination of employment); *Panceza v. IBM Corp.*, 363 Fed.Appx. 128, 131 (2d Cir. Feb. 2, 2010) (plaintiff's violation of company policy by accessing sexual materials on internet while at work was legitimate, nondiscriminatory reason for terminating employment); and *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 65 (2d Cir. 1997) (plaintiff's flagrant violation of company policy against fraternization with hourly employees was legitimate, nondiscriminatory reason for termination of employment).

### 3.      Pretext to Discrimination

Where the defendant articulates a legitimate, nondiscriminatory reason for its challenged actions, "the presumption of discrimination is rebutted and it 'simply drops out of the picture.'"  *Connell v. Consolidated Edison Co. of New York, Inc.*, 109 F.Supp.2d 202, 207 (S.D.N.Y. 2000) (quoting *St. Mary's Honor Center*, 509 U.S. at 510-11).  Then the plaintiff must show, "without the benefit of any presumptions, that more likely than not the employer's decision was motivated at least in part by a discriminatory reason."  *Id.* (citing *Grady v. Affiliated Center, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).  Plaintiff may do this by relying on the evidence already presented to establish a *prima facie* case of discrimination, as well as any additional evidence.  *Id.*  Further, "because the fourth prong of the prima facie case in this context is proof of circumstances giving

42

rise to an inference of discrimination, as a practical matter, there is little difference between the evidence that a plaintiff would present in proving just the prima facie case and pretext in proving the 'ultimate fact of discrimination.'" *Id.* at 208 n. 5.

In the instant case, Plaintiff has utterly failed to argue or to provide any evidence challenging Defendant's legitimate and non-discriminatory reasons for terminating Plaintiff's employment. Accordingly, Plaintiff has failed to establish the existence of any issue of fact requiring trial as to whether Defendant's proffered explanation is mere pretext for race-based discrimination.

Summary judgment therefore should be GRANTED in favor of Defendant on Plaintiff's racially disparate treatment claim.

### B.    Retaliation

Plaintiff alleges that since she filed her September 10, 2010 complaint with Pollack, "she has experienced extensive retaliation including but not limited to having up sale commissions [ ] stolen from her, and extensive harassment by co-workers." Amended Complaint ¶ 80. Plaintiff further maintains she has experienced "further acts of discrimination and retaliation for filing this lawsuit," *id.* ¶ 83, including the termination of her employment.

As stated, retaliation claims are subject to the *McDonnell Douglas* burden shifting analysis, requiring Plaintiff demonstrate a *prima facie* case of retaliation by establishing she engaged in protected activity under Title VII or the NYSHRL, that Defendants knew of the protected activity, that Defendants took an adverse action against Plaintiff, and a causal connection between the protected activity and the adverse employment action. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). *See Kirkland v. Cablevision*

*Systems*, 760 F.3d 223, 225 (2d Cir. 2014) ("[the plaintiff's] Title VII race discrimination and retaliation claims are subject to the *McDonnell Douglas* burden-shifting analysis."). In particular, "[t]o state a prima facie case of retaliation under Title VII, a plaintiff must proffer evidence that he engaged in a protected activity, such as complaining about race discrimination, and that his employer took an adverse action in retaliation." *Id.* (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).  Upon meeting this *de minimus* burden of establishing a *prima facie* case of retaliation, "a presumption of retaliation arises," shifting the burden to the defendants to "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  Nevertheless, the burden of proof for the causation element is high, requiring the plaintiff "establish his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Medical Center v. Nassar*, __ U.S. __; 133 S.Ct. 2517, 2534 (2013).  Should Plaintiff meet her burden of establishing a *prima facie* case of retaliation, "a presumption of retaliation arises," shifting the burden to the defendants to "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at 173.  Once Defendants have asserted a neutral reason for the alleged discriminatory action, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.*

"'To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment

action.'"  *Collins v. New York City Transit Authority*, 305 F.3d 113, 118 (2d Cir. 2002)

(quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590,

593 (2d Cir. 1988)).  Activity that is protected against retaliation includes not only formal

complaints filed with an agency such as the EEOC, or commencing a lawsuit, but also

internal complaints made to management.  *Raniola v. Bratton*, 243 F.3d 610, 624-25 (2d

Cir. 2001) (citing cases).  Although "in order to recover for retaliation for having filed

such a complaint, the plaintiff need not prove that her underlying complaint of

discrimination had merit," *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)

(citing cases), it is the plaintiff's obligation "to clarify to the employer that [s]he is

complaining of unfair treatment due to h[er] membership in a protected class and that

[s]he is not complaining merely of unfair treatment generally." *Lehman v. Bergmann*

*Associates, Inc.*, 11 F.Supp.3d 408, 417 (W.D.N.Y. 2014) (quotation omitted; alterations

in original).

        Here, with regard to the first element, as Defendants argue, Defendants'

Memorandum – Summary Judgment at 25-26, the only protected activity in which

Plaintiff engaged in connection with the instant action was the filing of the original

Complaint on March 25, 2011.  Specifically, Plaintiff's internal complaints do not

constitute protected activity because they are devoid of any indication that Plaintiff

believed she was being discriminated against based on her race, or based on any other

protected characteristic and, thus, such complaints are not protected.  Both in Plaintiff's

Complaint and Amended Complaint, however, Plaintiff alleges she was discriminated

against in regard to her employment based on Plaintiff's race, which constitutes

protected activity for purposes of establishing the first element of a *prima facie* case of

retaliation.  It is also undisputed that Defendants were aware of such protected activity as required for the second element of a retaliation claim.  Although the withholding of upsale commissions would constitute an adverse employment action, *see Curto v. Medical World Communications, Inc.*, 388 F.Supp.2d 101, 113 (E.D.N.Y. 2005) (denying motion to strike former employee's allegation of retaliation based on claim that supervisor and others were wrongfully plotting to steal former employee's commissions), Plaintiff points to no evidence that she was actually denied any such commissions actually earned and, in contrast, Defendants have submitted numerous affidavits made by persons with personal knowledge, of which Plaintiff has not challenged the veracity, explaining that Plaintiff was never wrongly denied an earned commission.  *See*, *e.g.*, Neudorf Affidavit ¶ 22 (explaining he had to redo an RA for a customer who complained Plaintiff never advised that an upsale to a different vehicle than the customer had reserved would cost an additional $ 35 per day, and because Plaintiff failed to have the customer initial the upsale rate on the original RA, Neudorf was unable to give Plaintiff credit for the upsale); Donnelly Affidavit ¶ 32 (same).  *See also* Neudorf Statement at 2 (stating Plaintiff usually was the top RSA in terms of rentals and upsales).  Nor do Plaintiff's vague references to increased harassment by unspecified co-workers establish an adverse employment action.  *See* Discussion, *supra*, at 33.  Nevertheless, as discussed in connection with Plaintiff's disparate treatment claim, Discussion, *supra*, at 37-40, the termination of Plaintiff's employment constitutes an adverse employment action as required for the *prima facie* case third element, leaving only the fourth element, *i.e.*, a causal connection between the protected activity and the adverse employment action to be established.

"'Title VII retaliation claims must be proved according to traditional principles of but-for causation,'  which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (quoting *Nassar*, 133 S.Ct. at 2533).  In addition to temporal proximity between the plaintiff's engaging in protected activity and the adverse employment action, this higher "but-for" causation standard may be fulfilled, either at the *prima facie* stage, or the pretext stage, by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Zann Kwan*, 737 F.3d at 846 (citing cases).

Here, the almost two-year period between Plaintiff's commencement of this action on March 25, 2011, and the termination of her employment on February 6, 2013, is too long to establish the temporal proximity that would support the requisite causal connection.  *See*, *e.g.*, *Dresssler v. City School District of the City of New York*, 2016 WL 4367967, at *4 (S.D.N.Y. Aug. 15, 2016) (18 months too long to establish causal connection between protected activity and adverse employment action); *Spavone v. Fischer*, 2012 WL 360289, at *5 (S.D.N.Y. Feb. 3, 2012) (finding 15 months inadequate to establish causal connection through temporal proximity); and *Crawford v. Braun*, 2001 WL 127306, at *6 (S.D.N.Y. Feb. 9, 2001) (holding seven-month lapse too "attenuated" to establish temporal proximity).  Nor has Plaintiff pointed to any "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Zann Kwan*, 737 F.3d at 846

Moreover, just as Defendant has provided in connection with Plaintiff's disparate treatment claim legitimate, nondiscriminatory reasons for terminating Plaintiff's employment, *see* Discussion, *supra*, at 37-40, which reasons Plaintiff has failed to demonstrate may be mere pretext for discrimination, such failure also establishes Plaintiff cannot show the legitimate, nondiscriminatory reasons are mere pretext to Defendants' alleged retaliation.

Accordingly, Defendant's motion for summary judgment should be GRANTED as to Plaintiff's retaliation claim.

### C.    Hostile Work Environment

Although inartfully pleaded, Plaintiff does allege she was subjected to a hostile work environment while employed by Avis.  Amended Complaint ¶¶ 82, and 111[a].  It is significant that the criteria for establishing a disparate treatment claim, which employs the *McDonnell Douglas* burden shifting analysis, are different than those for a hostile work environment claim, which does not.  *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (recognizing distinction between *McDonnell Douglas* burden-shifting framework and hostile work environment analysis).  *See also Nichols v. Volunteers of America, North Alabama, Inc.*, 470 Fed.Appx. 757, 766 & n. 1 (11th Cir. Apr. 18, 2012) (citing cases comparing elements of hostile work environment claim, with discrimination elements and retaliation elements under *McDonnell Douglas*).  Specifically, to establish a hostile work environment claim, "'a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Rivera v. Rochester Genesee Regional*

*Transportation Authority*, 702 F.3d 685, 693 (2d Cir. 2012) (quoting *Gorzynski*, 596 F.3d at 102 (further internal quotation omitted)).  "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance."  *Id.* (quoting *Hyut v. State University of New York*, 352 F.3d 733, 745 (2d Cir. 2003)).  "Moreover, the 'test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  "Of course, '[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic,' such as race or national origin."  *Id.* (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79-80 (1998)))).  As such, in opposing summary judgment on a hostile work environment claim, the plaintiff must produce evidence "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the

employer." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir.) (internal quotation omitted), *cert. denied*, 540 U.S. 1016 (2003).

"Of course, '[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic,' such as race or national origin." *Rivera*, 743 F.3d at 20 (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.")).  In the instant case, Plaintiff, as an African-America, is a member of the protected class of race, and thus has met the threshold criteria for a hostile work environment claim.  Nevertheless, the record establishes that Plaintiff cannot meet her burden to survive summary judgment as to any Defendant.

### 1.    Discriminatory Intimidation in Workplace

With regard to the first criteria, "'courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse.'" *Moll v. Telesector Resources Group, Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano*, 294 F.3d at 374 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993))).  "'Facially [race-]neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on [race].'" *Id.* (quoting *Alfano*, 294 F.3d at 378).  In the instant case, Plaintiff's hostile work environment claim rests on

a single incident in which Neudorf, while engaged in a somewhat heated exchange with Plaintiff regarding a scheduling snafu in which Plaintiff, believing another RSA was scheduled to work, failed to report for her shift, allegedly told Plaintiff he "just got rid of another African American girl for giving [Neudorf] lip."  Plaintiff's Dep. Tr. Pt. 1 at 92; *see id.* at 92-99.  Neudorf denies making the statement, asserting only that he showed restraint by not disciplining Plaintiff for not reporting for her scheduled shift, and that if Plaintiff had any question as to whether she was supposed to work at the time in question, she could have asked either Neudorf or Chappell who was the manager responsible for preparing the work schedule.  Neudorf Affidavit ¶¶ 58-63.  Neudorf also asserts that Plaintiff's failure to mention the incident prior to her deposition indicates she has fabricated the claim.  *Id.* ¶ 61.

Regardless of whether Neudorf made the statement as Plaintiff asserts, courts have routinely found far more egregious incidents insufficient to support a hostile work environment claim.  *See*, *e.g.*, *Craig v. Yale University School of Medicine*, 2013 WL 789718, at * 14 (D.Conn. Mar. 4, 2013) (holding harassment and deplorable treatment, including work pressure, inhospitable treatment, and humiliation, were insufficiently severe so as to permeate the workplace with discriminatory intent and establish a hostile work environment).  With the exception of the single remark attributed to Neudorf, Plaintiff's other allegations regarding her hostile work environment claim are no more than Plaintiff's subjective attribution of every difficulty Plaintiff encountered with her co-workers to Plaintiff's race.  *See*, *e.g.*, Plaintiff's Dep. Tr. Pt. 1 at 84-85 (explaining another RSA, Blask, inquired whether Plaintiff's hair was all her own and asking to touch Plaintiff's hair); *id.* at 87-90 (describing how on three of four occasions, all the

RSAs ordered pizza and chicken wings, but the other RSAs ate first while Plaintiff was working in the kiosk, and when Plaintiff went to eat, the food was picked over and not appealing); and Plaintiff's Dep. Tr. Pt. 3[31] at 326-27, and 424-25 (describing how one Diane Brown, who is African-American, attempted to provoke an altercation with Plaintiff by repeatedly slamming the kiosk door).  Because these assertions are not supported by any evidence, they fail to survive summary judgment.  *See Thompson v. Board of Trustees Community-Technical Colleges*, 2014 WL 2048580, at * 5 (D.Conn. May 19, 2014) (holding plaintiff's reliance on conclusory and subjective beliefs that his co-workers were engaging in activity intended to create a racially-hostile work environment, unsupported by any evidence in the record, failed to sustain the plaintiff's hostile work environment claim).

Accordingly, the single incident of an inappropriate racial nature in the instant case, although attributed to a supervisor, even if believed, is insufficient to establish the requisite discriminatory intimidation in the work place to support a hostile work environment claim and, on this record, no reasonable juror could find otherwise.

## 2.    Basis to Impute Offensive Conduct to Employer

Even assuming, *arguendo*, that Plaintiff successfully pointed to some evidence that could be construed by a reasonable jury as establishing that she experienced a hostile work environment, Defendants would not be liable absent "a specific basis [ ] for imputing the objectionable conduct" to Avis.  *Alfano*, 294 F.3d at 373.  "When the harasser is a supervisor, the employer is presumed to be absolutely liable."  *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) (citing *Faragher v. City of Boca*

---

[31] References to "Plaintiff's Dep. Tr. Pt. 3" are to the transcript of the third day of Plaintiff's deposition, *i.e.*, September 5, 2014.

*Raton*, 524 U.S. 775, 807 (1998)).  Accordingly, although Plaintiff admits she never reported the incident regarding the alleged comment by Neudorf, asserting that she called Moussavian, but did not leave a message when Moussavian did not answer her telephone, Plaintiff's Dep. Tr. Pt. 1 at 95-97, because it is Neudorf, Plaintiff's supervisor, who is alleged to have made the racially-offensive comment, the record would support imputing such comment to Avis.  The record thus fails to establish only the first prong of Plaintiff's claim that she was subjected to a hostile work environment.

Summary judgment therefore should be GRANTED in favor of Defendants on Plaintiff's hostile work environment claim for failure to establish the first prong, *i.e.*, discriminatory intimidation in the workplace, but not based on failure to establish the second prong, namely, a basis for imputing the alleged unlawful conduct to Plaintiff's employer.

### 3. Faragher/Ellerth Defense

Alternatively, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim based on the *Faragher/Ellerth* affirmative defense.  As stated, "[b]eyond demonstrating a hostile work environment, a plaintiff must show a basis for imputing the objectionable conduct to the employer."  *Gorzynski*, 596 F.3d at 103  (citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). "When [ ] the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer."  *Id.* (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).  "But even then the defending employer may be permitted, subject to proof by a preponderance of

the evidence, to raise the *Faragher/Ellerth* affirmative defense to liability or damages."
*Id.*

The *Faragher/Ellerth* defense, named for two cases the Supreme Court decided
the same day, including *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and
*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), provides that "an employer is
strictly liable for supervisory harassment that 'culminates in a tangible employment
action, such as discharge, demotion, or undesirable reassignment.'"  *Pennsylvania
State Police v. Suders*, 542 U.S. 129, 137 (2004) (citing *Faragher*, 524 U.S. at 765, and
*Ellerth*, 524 U.S. at 808).  *See also Ellerth*, 524 U.S. at 761 (identifying as tangible
employment actions "hiring, firing, failing to promote, reassignment with significantly
different responsibilities, or a decision causing a significant change in benefits").  The
*Faragher/Ellerth* defense also shields an employer from liability where the employer
maintains an anti-harassment policy with which an employee has failed to demonstrate
compliance.

The *Faragher/Ellerth* defense consists of two elements providing that even if a
supervisor's behavior resulted in a tangible employment action against the plaintiff, the
employer will not be liable if (1) "the employer exercised reasonable care to prevent and
correct promptly any [discriminatory] harassing behavior," and (2) "the plaintiff employee
unreasonably failed to take advantage of any preventative or corrective opportunities
provided by the employer or to avoid harm otherwise."  *Gorzynski*, 596 F.3d at 103
(quoting *Faragher*, 524 U.S. at 807).  With regard to the first element, the maintenance
of a written anti-harassment policy providing a procedure for an employee who is the
victim of harassment to report the harassment to the Defendant for investigation

satisfies the first element.  *See Gorzynski*, 59 F.3d at 103-04 (finding employer's

maintenance of formal, written anti-harassment policy providing procedure for Plaintiff to

report harassment to employer for investigation satisfies first element of

*Faragher/Ellerth* defense); *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006)

("An employer may demonstrate the exercise of reasonable care, required by the first

element [of the *Faragher/Ellerth* defense], by showing the existence of an

antiharassment policy during the period of the plaintiff's employment . . . .").  "With

regard to the second element, "proof that an employee has unreasonably failed to use

the employer's complaint procedure normally suffices to satisfy the employer's burden."

*Ferraro*, 440 F.3d at 102 (citing *Faragher*, 524 U.S. at 807; and *Ellerth*, 524 U.S. at

765).

　　　　Here, it is undisputed that Avis provided each newly-hired employee, including

Plaintiff, with a copy of Avis's Code of Conduct, for which Plaintiff, on May 15, 2007,

signed an acknowledgement of its receipt, as well as a copy of Avis's Anti-Harassment

Policy," a formal, written policy prohibiting employees from engaging in any

discrimination, harassment, and retaliation based on, *inter alia*, race, color, and national

origin.  Anti-Harassment Policy at 1-2.  A copy of the Anti-Harassment Policy was also

posted on the back wall of the Avis office.  Plaintiff's Dep. Tr. Pt. 3 at 337.  The Anti-

Harassment Policy provides not only that Avis is committed to ensuring all employees

"enjoy a safe, professional, respectful and productive work environment, free from

behavior, actions or language constituting discrimination or harassment," Anti-

Harassment Policy at 1, but that Avis also has "zero tolerance" for discrimination or

harassment of any kind including, *inter alia*, based on race, by any employee.  *Id.*  A

"Complaint Procedure" sets forth the manner in which employees are to report any discriminatory or harassing behavior, and no employee is to be penalized or reprimanded for making such a report.  *Id.* at 2.  Defendant's provision of the Anti-Harassment Policy satisfies the first *Faragher/Ellerth* defense element.  Significantly, the record is devoid of any evidence or claim by Plaintiff that Plaintiff made any attempt to comply with procedures established by Avis's Code of Conduct and Anti-Harassment Policy, and Plaintiff neither denies or makes any attempt to explain such failure. Plaintiff's failure to follow the prescribed procedure in complaining about the racial discrimination alleged here establishes Plaintiff failed to meet her burden as to the second element.

Accordingly, Defendant has also established the absence of any triable issue of fact demonstrating Plaintiff availed herself of the complaint procedure provided by Avis's Code of Conduct and Anti-Harassment Policy, thus warranting summary judgment based on Defendant's *Faragher/Ellerth* defense.

### D.   New York State Human Rights Law

"[D]iscrimination claims under the HRL are evaluated using the same analytical framework used in Title VII actions."  *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012).  Accordingly, for the same reasons Plaintiff's disparate treatment, retaliation, and hostile work environment claims fail under Title VII and § 1981, summary judgment on such claims under NYSHRL should be GRANTED.

Furthermore, Plaintiff asserts her Fifth Claim against only Defendant Neudorf, yet relief for employment discrimination claims under NYSHRL may be only obtained only from an employer.  *Herman v. Blockbuster Entertainment Group*, 18 F.Supp.2d 304,

313-14 (S.D.N.Y. 1998) (considering whether corporate defendant and major

shareholder in plaintiff's corporate employer exercised sufficient control over plaintiff so

as to be held liable as an employer under NYSHRL), *aff'd*, 182 F.3d 899 (2d Cir.), *cert.*

*denied*, 528 U.S. 1020 (1999).    Accordingly, summary judgment should be GRANTED

on Plaintiff's fifth claim, asserted under NYSHRL against Defendant Neudorf.


## CONCLUSION

Based on the foregoing, Plaintiff's Motion for Late Filing (Dkt. 194), is DENIED;

Defendants' Cross-Motion to Strike (Dkt. 195), is GRANTED; Defendants' Motion for

summary judgment (Dkt. 169), should be GRANTED; Plaintiff's Motion Opposing

Summary Judgment (Dkt. 184) should be DENIED.   The Clerk of the Court should be

directed to close the file.

SO ORDERED, as to Plaintiff's Motion for
Late Filing (Dkt. 194), and Defendants'
Cross-Motion to Strike (Dkt. 195).

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Respectfully submitted, as to Defendants' Motion
for Summary Judgment (Dkt. 169), and Plaintiff's
Motion Opposing Summary Judgment (Dkt. 184),

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      January 4, 2017
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with 28 U.S.C. § 636(b), Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72(b).

**ANY APPEAL** of this Decision and Order must be taken by filing written objection with the Clerk of the Court not later than 14 days after service of this Decision and Order in accordance with 72(a) of the Federal Rules of Civil Procedure, and Local Rule 72(a).

**<u>Failure to file objections or appeal within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        January 4, 2017
             Buffalo, New York